FRANK D. WINN, Appellant, v. AMERICAN EXPRESS COMPANY, Appellee.

**Carriers:** TRANSPORTATION OF LIVESTOCK: NEGLIGENCE: BURDEN OF PROOF: EVIDENCE. One claiming that an animal, delivered to an express company for transportation, and which died from excessive heat while being conveyed to the station, has the burden of showing that its death was the result of defendant's negligence. In the instant case the evidence is insufficient to sustain this burden.

**Same:** NEGLIGENCE: PRESUMPTION. It will not be presumed that an animal died from excessive heat as the result of negligence on the part of the carrier, while being transported by it to the station in an express wagon, where the owner accompanied the driver, knew all the facts and the driver obeyed his directions.

**Same:** CLIMATIC CONDITIONS: ASSUMPTION OF RISK: EVIDENCE. The shipper and not the carrier of a fat hog, liable to be affected with the heat, assumes the risk arising from the climatic conditions. The evidence in this case fails to charge defendant with liability for failing to provide unusual facilities for keeping the animal cool.

*Appeal from Polk District Court.*—HON. HUGH BRENNAN, Judge.

TUESDAY, MARCH 18, 1913.

THIS is an action for damages against the defendant as a common carrier for alleged negligence in the transportation

of a valuable hog. At the close of the evidence the trial court directed a verdict for the defendant. Plaintiff has appealed. —*Affirmed.*

*Franklin & Miller,* for appellant.

*Guernsey, Parker & Miller,* for appellee.

EVANS, J.—The case in some of its features has been before us in a former appeal. *Winn v. American Express Co.,* 149 Iowa, 259.

The plaintiff holds his cause of action by assignment from one Ward, who was the shipper of the hog in question. The hog was a valuable boar, known in this record by the name of

1. CARRIERS: transportation of livestock: negligence: burden of proof: evidence.

"Statesman." He had been exhibited at the State Fair at Des Moines in August, 1907. On the evening of August 30th he was delivered, crated, at the fair grounds to one of the express drivers, to be carried by express wagon from the fair grounds to the Northwestern Depot, from which point he was to be transported by express to Lincoln, Neb., over the Northwestern Railway. The day in question was excessively hot and humid; some hogs on exhibition at the fair grounds having died during the day as a result thereof. The contract for transportation was made at 6 : 30 p. m., at which time the thermometer stood at nearly ninety degrees, with a humidity of sixty-eight. The hog was loaded about 7 p. m. His crate was one of ten upon the same wagon, and was placed at the rear of the wagon. The trip from the fair grounds to the Northwestern Depot, a distance of two or three miles, was made in about one hour and a half between 7 and 9 p. m. The petition charges negligence as follows:

That the American Express Company did negligently load the said boar in said tranfer wagon with nine other crated hogs, . . . so as to shut off the free circulation of air from the said boar Statesman, . . . did negli-

gently drive the said wagon with said boar therein over a very rough route, there being a much better and smoother route they could have selected, . . . and did negligently handle the said boar from the time they received him until he was unloaded, five minutes before his death, and failed wholly to use any care whatever with said boar; that the driver in a careless manner over the rough roads and across the said railroad tracks many and divers times did greatly shake up and jolt and jostle the said boar, and did heat up the said boar to a dangerous temperature; that the said J. J. Ward was free from any and all contributory negligence whatever.

An amendment to the petition alleged as follows:

That defendant did not provide, on said wagon on which said boar with other hogs was loaded, any water for cooling the said boar, in case he should become dangerously hot. That said driver of said wagon did drive in the roughest part of the street from the fair grounds to the depot; there being a smoother portion that could have been used. That said defendant failed to unload said boar immediately upon its arrival at the depot, but did keep said boar on said wagon for a period of thirty minutes after said depot was reached. Plaintiff alleges that said defendant was negligent in not providing water on said wagon with which to cool said boar in case he should become dangerously hot, and in driving said wagon and contents over the roughest part of said street when a smoother part existed and could have been used, and in not unloading said boar immediately upon its arrival at said depot, and in keeping said boar on said wagon for thirty minutes after arriving at said depot.

The answer included a general denial with other defenses.

The shipper rode upon the express wagon with the driver all the way from the point of delivery to the Northwestern Depot, where the hog died shortly after arrival. The shipper testified as follows:

I was present when they loaded the hog on the wagon. I made no comment as to the manner in which the hog was

handled.  The wagon was provided with springs, front and
rear.  It was what I would call a full platform spring wagon.
They started as soon as my hog was put on the wagon.  No
one besides the driver and myself went along.  The route
we took was a direct one, and we did not turn or twist.  I
do not know of any more direct route.  We stopped the first
time about three-fourths of a mile from the pavilion, at my
request.  He waited ten minutes or so.  He had been driving
at a common gait.  I suggested that he drive with one wheel
in the gutter, and he complied with it kindly, courteously,
the best he could.  He complied with every suggestion that
I made, with the exception of getting water.  I assented to the
driver going ahead, and made a suggestion about getting
water at the second stop, east of the Capitol building.  There
was some buildings around there.  I made no effort to get
water from any of the buildings.  The driver drove care-
fully.  I think he drove a little slower after the first stop
than he did before.  At the second stop, made at my request,
we waited about ten minutes, I think.  I drove down the
hill, and the driver manipulated the brake.  I was ready to
go when we started after the second stop.  I made no com-
plaint about starting up again.  During the second stop I
got down and examined the hog.  I did not look around for
any water at that time.  The hog showed a fairly good condi-
tion.  I did not make any complaint of the manner in which
the driver got to the depot, so far as he is concerned; but if
there had been any other way possible to avoid that ever-
lasting shaking over the street car tracks I would have made
a kick on that. . . . I think we kept on down Grand
avenue until we crossed the Northwestern tracks, then turned
to the left.  There was a series of street car tracks, I don't
know how many, . . . before we reached the depot.
When we made our fourth stop, we were at the Northwestern
Depot. . . . I think the Northwestern tracks cross this
street, Grand avenue, the one on which we were driving
west; and if the depot was on the west side of the North-
western tracks the driver had to cross the tracks to get to the
depot.  When he crossed the Northwestern tracks, he was
on the street crossing proper.  I do not think that he drove
off the street.  I think he was on the regular highway cross-
ing.  When he turned to the left or south after crossing the
Northwestern tracks, my recollection is that he crossed a

double street car track. He crossed a street car track on Grand avenue. I do not know whether it was a double track or a single track. Then, just as he got near the depot, he crossed a double street car track right at the end of the covered shed of some kind, which was there. I do not think that the driver got out of the wagon track at any time. I have no notion that he drove outside of the limits of the street at any time, and I do not claim anything of that kind. I simply claim that the track in the street was rough by reason of the street car rails which the driver crossed.

The issue of negligence necessarily centers upon the specifications of the petition. The burden of proof was on the plaintiff. *Colsch v. Railway Co.*, 149 Iowa, 176; *Mosteller v. Railway Co.*, 153 Iowa, 390.

Some contention is made by appellant for the benefit of a presumption of negligence by reason of the fact that the hog died while in the possession of the defendant, after having been delivered to the defendant in alleged good condition. When such presumption prevails, it is predicated upon the fact that in shipment by rail a shipper has little opportunity for actual observation or inspection; and that much necessarily occurs in the course of such shipment concerning which the shipper can furnish no direct evidence. Nothing of that kind is presented in the case before us. The distance was short. The time was brief. The climatic conditions were known. The shipper selected the time. He accompanied the shipment by riding upon the wagon, and the hog was within his observation, and the conduct of the driver was within his direct knowledge, every foot of the way. He knew every detail of all that occurred. The plaintiff pleaded it, and the shipper testified to it. For the purpose of this appeal, the appellant is entitled to have such testimony deemed as true. But he is not entitled to have it enlarged by mere presumption. The case presented is not one which calls for the application of such a rule; and this is so regardless of the particular form of pleading.

We have read this evidence with much care, and we reach

the conclusion that the trial court properly directed the verdict. We do not think that this evidence would sustain a finding by a jury that the death of the hog was caused through any wrongful act or omission of the defendant company. A finding to that effect would be purely arbitrary.

The hog in question was very fat, and weighed six hundred pounds. It is the appellant's contention that it died from overheating, and that the method by which he was handled caused, or at least aggravated, such over-

3. SAME: climatic conditions: assumption of risk: evidence. heating. It is undisputed that the climatic conditions of the day were such as to endanger the life of such an animal, whether he remained in the pen or was transported by wagon. That risk belonged to the shipper, and was in no manner assumed by the carrier. The carrier owed the duty of reasonable care under all the circumstances. *Golsch v. Railway Co., supra.* We find nothing in Ward's evidence which has any fair tendency to show improper or negligent conduct on the part of the driver of the wagon. Indeed, his evidence affirmatively shows the contrary. Some stress is laid in argument upon the failure of the defendant company to furnish a supply of water for the purpose of cooling the hog.

It is urged that the express wagon should have carried with it a supply of water for that purpose. It is not contended that such facilities are usually or ordinarily provided by express wagons, or that they are usually or ordinarily necessary. The substance of the contention is that, because of heat of this particular day and the condition and size of this particular animal, such provision ought to have been made. If such provision for this particular occasion ought to have been foreseen, it was as apparent to the plaintiff as to the defendant. The shipper could at least have used water upon the hog immediately before loading him. He did not appear to have deemed it necessary. The driver of the wagon complied with his every request and suggestion. He stopped when he asked him to stop and started again only with his approval. They passed

scores of dwellings and stopped in front of some of them. Presumably the shipper could have obtained a pail of water from any of them for the asking. He did not at that time deem it worth while. He repeatedly assured the driver that the hog was improving. The defendant violated no legal duty in failing to carry barrels of water upon its express wagon; nor is there anything in the evidence to warrant a finding by the jury that ordinary care required such provision. The record is too voluminous for us to undertake to deal with the evidence in its details.

We think the order of the trial court was proper; and it is accordingly *Affirmed.*