VINCENT, ALBIN & STRAHL, Appellee, v. WALKER D. HINES, Director General of Railroads, Appellant.

**CARRIERS:** Carriage of Live Stock—Negligence (?) or Vicious Propensities (?) Evidence held to present jury question on the issue whether injury to stock was because of the unreasonably rough handling of the train or because of the inherent viciousness of the animals.

EVIDENCE:   Value—Selling Price—Jury Question.  Evidence of the
2   amount received, at a good-faith public auction, for damaged live
stock, together with evidence that such amount was the fair value
of the stock in its then condition, presents a jury question on the
issue of value.

PRINCIPAL AND AGENT:   Evidence—Declarations.  A showing that
3   a shipper found a person in the railway yards at a place where
the yardmaster might naturally be, and *assumed* that such person
was the yardmaster, is quite insufficient to justify the reception
in evidence of the declarations of such person relative to the con-
dition of the shipper's stock.

EVIDENCE:   Res Gestae—Narrative of Past Event.  Statements by a
4   carrier's yardmaster as to what *had* happened to stock while it was
being transported, and impliedly admitting negligence in the han-
dling of the stock, are not receivable as part of the *res gestae*.

*Appeal from Johnson District Court.*—RALPH OTTO, Judge.

SEPTEMBER 26, 1924.

REHEARING DENIED DECEMBER 11, 1924.

ACTION to recover damages to a carload of horses while in
transit from West Branch, Iowa, to East St. Louis, Illinois.
Verdict and judgment for plaintiff, and defendant appeals.—
*Reversed.*

*J. G. Gamble, A. B. Howland,* and *Clearman & Olsen,* for
appellant.

*George C. Hoover* and *A. E. Maine,* for appellee.

STEVENS, J.—Appellee, a copartnership, was, in 1918, en-
gaged in the business of buying and shipping horses to market.
On January 3d of that year, a carload containing twenty-four
horses and one mule was delivered to appellant
by appellee at West Branch, Iowa, for transpor-
tation to Atlanta, Georgia.  The car was carried
over appellant's lines to Burlington, where it
was delivered to the Chicago, Burlington & Quincy Railway

1. CARRIERS: car-
riage of live
stock: neg-
ligence (?) or
vicious pro-
pensities (?)

Company, a connecting carrier, by which it was transported to East St. Louis, Illinois. B. F. Strahl, one of the members of the copartnership, accompanied the stock from the initial station to Old Monroe, Missouri, at which place he left the horses, and went by train to East St. Louis. The horses were unloaded at Burlington and placed in the stockyards by the employees of the Chicago, Burlington & Quincy Railway Company, and reloaded by employees of the stockyards company into another car. The reason for transferring the horses at Burlington to another car was that the car in which they arrived was in bad order. Some of the slats on one side were broken and missing, and the car was otherwise defective. Strahl observed the horses at Burlington, one of which was down in the car, but took no part in unloading or reloading them at that place. After the train left Burlington, Strahl saw nothing of the horses until just before the train departed from Old Monroe, Missouri. Standing on the platform of the caboose at that place, he saw the car pass on a siding. He remained in the caboose, however, and went directly to East St. Louis. The car was unloaded at Old Monroe, where the horses were, presumptively, fed and watered by the employees of the carrier. The evidence does not show who handled them at this point. The horses, according to the testimony of the conductor in charge of the train, arrived at East St. Louis at 8:45 A. M., January 6th, which was Sunday. Strahl testified that he saw the car as it passed him in the yards at East St. Louis, and that two of the animals were penned off from the rest. When he located the horses in the stockyards on Sunday afternoon, the mule and one horse were missing. Strahl was given free transportation by the appellant, and accompanied the stock as a caretaker. The shipping contract is not before us, and we are, therefore, not advised as to the exact duties assumed by him as such caretaker. He was not advised that a transfer would be made of the horses to another car at Burlington, or that the horses would be unloaded for feed and water at Old Monroe, Missouri. The carrier assumed charge of the unloading of the horses at Burlington and at Old Monroe.

I. A motion to direct a verdict for appellant was made at the close of the evidence for appellee, and renewed at the

close of all of the evidence. The motion was overruled. A motion for a new trial was filed and also overruled.

It is now urged by appellant that these motions should have been sustained upon the grounds that there was no competent evidence of negligence to be submitted to the jury; that the verdict was against the weight of the evidence; and that it was not sustained thereby. The case was tried and submitted to the jury in the court below upon the theory that the burden of proving negligence was, at all times, upon appellee.

It is, no doubt, the general rule, many times declared by this court, that, where a shipment of live stock is accompanied by the shipper or someone representing him, as a caretaker, the burden of proof is upon the plaintiff to show that the damage for which recovery is sought was caused by the carrier's negligence; but the carrier is not, however, because of the duty assumed or imposed upon the caretaker, relieved from liability for any damage that is the result of its negligence. *Grieve v. Illinois Cent. R. Co.*, 104 Iowa 659; *Westphalen v. Atlantic N. & S. R. Co.*, 152 Iowa 232; *Mosteller v. Iowa Cent. R. Co.*, 153 Iowa 390; *Hanley v. Chicago, M. & St. P. R. Co.*, 154 Iowa 60; *Thompson v. Chicago & N. W. R. Co.*, 158 Iowa 235; *Winn v. American Exp. Co.*, 159 Iowa 369; *Gibson v. Adams Exp. Co.*, 187 Iowa 1259; *Nugent v. Chicago & N. W. R. Co.*, 183 Iowa 1073.

If, under the contract of shipment, it was the duty of the caretaker in this case to see to the unloading, feeding, watering, and reloading of the horses, he failed in its performance. Whether this was due to his own or the carrier's fault was a question of fact, properly to be determined by the jury. That the horses were severely scratched, cut, and otherwise injured in transit is not denied by appellant. The only direct evidence of negligence on the part of appellant, or the connecting carrier, is the testimony of Strahl, to the effect that the trains were roughly handled. He testified that, while sitting on one of the benches in the caboose, about six feet in length, he was slid the entire length of the seat by the violent movement of the train. No accident occurred, and, so far as the witness knew, the only negligence of the employees in charge of the train was in roughly

handling it. The evidence on the part of appellant showed that, when the car arrived at West Liberty, some of the slats were broken out of one side of the car, and a horse's foot was protruding through the opening made thereby. The horse's foot was disengaged by the trainmen, who gave no notice to Strahl of the incident. The employees of the Chicago, Burlington & Quincy Railway Company and of the stockyards company at Burlington testified that some of the horses were scratched, cut, and otherwise injured when they were unloaded from the car at that place, and that, while they remained in the stockyards they were nervous and restless, kicked the hayracks to pieces, and manifested other signs of viciousness. They further testified that they had no difficulty in unloading or reloading the animals in the car. Strahl testified that two of the animals were down when the car passed the caboose in which he was riding at Old Monroe, Missouri. No testimony was offered by either party as to the condition or behavior of the horses at Old Monroe. When Strahl located them in the stockyards, at East St. Louis, one horse and the mule were missing. Five only of the twenty-three were uninjured. Strahl wired from East St. Louis for Vincent, and when he arrived, it was decided to discontinue the shipment to Atlanta, and to turn the horses over to commission men for sale at East St. Louis. The horses were sold at public auction on January 8th for $1,087.50.

Conductors on the connecting carrier were changed at Burlington and at Hannibal, Missouri. Each conductor who had anything to do with the shipment was called and testified as witnesses on behalf of appellant. Each denied that the train in his charge was roughly handled, or that any accident occurred by which injury could have been done to the horses. The conductor who observed the horses at West Branch testified that they were quiet, and that he saw no signs of restlessness or viciousness on the part of any of the horses. Strahl and other witnesses called on behalf of appellee testified that the horses were mostly purchased from farmers; that they were mostly old, and well broken, both single and double; that they observed them in the yards at West Branch before they were loaded into the car; and that they saw no unusual tendency on their part

toward kicking, fighting, or other signs of viciousness. The principal testimony as to the alleged vicious character of the animals was given by the witnesses who saw them at Burlington. Two of the horses were down when they arrived at that point, and one witness testified that, because of the nervousness of the horses, they were unable to get them up until the car was unloaded. He testified that the horses did considerable stamping, and were nervous. An inspector for the Chicago, Burlington & Quincy Railway Company testified to the same effect, and, in addition, that he saw the horses kicking while in the stockyards. These witnesses were corroborated by the testimony of a car repairer and one of the employees of the stockyards company. The latter testified that they were the worst bunch of kickers he ever saw. The testimony of the employees of the railway company that the train was not roughly handled was corroborated by that of another shipper who was in charge of a stallion which was being shipped to East St. Louis.

On the question of rough handling of the train, the evidence is slight, but we think it was sufficient to justify the submission to the jury of the issue of appellant's negligence. The question whether the damage to the horses was the result of appellant's negligence or of the inherent viciousness of the animals was a question of fact for the jury. The court could not determine this issue as a matter of law. The case differs essentially and in principle from *Hunt v. Chicago, B. & Q. R. Co.*, 181 Iowa 845, cited and relied upon by appellant. The controversy there was between the company and an employee. The holding in that case that the jerking of a freight train, even though severe and unusual, is not, of itself, evidence of negligence of an employee engaged in operating the same, is not applicable to a shipment of live stock. It is the duty of a common carrier in transporting live stock to operate its train in a reasonably careful and safe manner, so as to avoid injury or damage thereto. The failure to exercise such care would constitute negligence; and, if injury or damage resulted, liability would follow.

It is also contended by appellant that the evidence is insufficient to sustain the verdict for the further reason that no competent evidence of the loss sustained by appellee was offered.

2. EVIDENCE: value: selling price: jury question.

This contention presents a close question, but we are inclined to the view that sufficient competent evidence was introduced to carry the issue to the jury. The horses were sold at public auction in East St. Louis, and there is no claim that the sale was not in good faith and for the purpose of realizing the best possible price therefor. Evidence of the price received at public auction, where the sale was fair and in good faith, is admissible as tending to prove value. *Sanford v. Peck,* 63 Conn. 486 (27 Atl. 1057) ; *Maguire v. Pan-American Amusement Co.,* 211 Mass. 22 (97 N. E. 142) ; *George v. Lane,* 80 Kan. 94 (102 Pac. 55) ; *Moore v. Lachmund,* 59 Ore. 565 (117 Pac. 1123).

Evidence of the purchase price of personal property is admissible, generally, to prove value. *Kuhlman v. Wieben,* 129 Iowa 188; *Hanley v. Chicago, M. & St. P. R. Co.,* 154 Iowa 60 ; *Carnego v. Crescent Coal Co.,* 164 Iowa 552; *Mullen v. Eastern Trust & Banking Co.,* 108 Me. 498 (81 Atl. 948) ; *Ackerman v. Rubens,* 167 N. Y. 405 (60 N. E. 750).

Strahl testified that he was present at the sale and saw each of the horses sold, and that the aggregate amount received was $1,087.50. It is not quite clear from the record whether the testimony of this witness as to the amount received was based upon his personal knowledge or upon the amount received from the commission men; but in any event, he further testified that it represented the fair and reasonable market value of the horses at St. Louis, with which he was familiar, in the condition they were in at the time of the sale. No testimony was introduced by appellant on this point. If the case rested alone upon the testimony of the witness as to the amount received from the commission men, we are inclined to think it would be insufficient. As bearing upon the admissibility of evidence of this character, see *Perlman v. Levy,* 109 N. Y. Supp. 785. The form of the question propounded to the witness as to the market value of the horses was somewhat awkward; but his competency was shown, and we think the court did not abuse its discretion in letting the answer stand. The fair market value of each horse, if it had been in good condition in the market at East St. Louis, was shown by the testimony of two witnesses. Of course, the

better practice would have been for counsel to have shown the market value of each horse in the condition in which it was received from the carrier.

11.    Strahl testified that a man whom he saw in the railroad yards at East St. Louis told him that the horses were in the stockyards, and that one horse and the mule had been killed.

3. PRINCIPAL AND AGENT: evidence: declarations. The admissibility of this testimony is challenged by appellant, who strenuously objected below to its introduction, upon the ground that it was hearsay, and that it was not shown that the party with whom the witness talked was the agent of the carrier.  An amendment to appellant's abstract was filed by appellee, from which it appears that objections were sustained to all of the questions propounded to the witness which were designed to elicit information as to the agency of the party in question, except the following:

"Q.  Did you talk with anyone there purporting to be the yardmaster?  A.  Yes, sir.  Q.  Did you learn from the yardmaster where the horses were?  A.  Yes, sir.  Q.  What did he tell you about the shipment?  A.  He told me two of the number had been killed, and where I might find the balance.  Q.  Where did he tell you you could find the balance of the horses?  A.  In the stockyards, the Union Stockyards.  Q.  Did you go over to the stockyards where he indicated the horses were to be found?  A.  Yes, sir.  Q.  How do you know this man you say was the yardmaster was the yardmaster?  A.  That is what he appeared to be from all appearances.  I didn't ask them whether they were, or ask him to produce any evidence.  Q.  You saw some working man around the yards you thought was the yardmaster?  A.  This man represented himself as being in charge of the yards.  Q.  Did he tell you he was in charge of the yards?  A.  No, sir, not in so many words."

Before the declarations of an agent which seek to bind the principal will be received in evidence, a prima-facie case of agency must be established.  *Drake v. Chicago, R. I. & P. R. Co.,* 70 Iowa 59; *Winch v. Baldwin,* 68 Iowa 764; *McPherrin v. Jennings,* 66 Iowa 622.  Agency cannot be established by the statements and declarations of the agent.  *Lavelleur v. Nugent,*

186 Iowa 234. To make the declarations of an agent admissible in evidence as against his principal, they must have been made while he was engaged in the performance of the duties of his agency, and must have related to the subject-matter thereof. *Verry v. B., C. R. & M. R. Co.*, 47 Iowa 549; *McPherrin v. Jennings*, supra; *Winch v. Baldwin*, supra; *Drake v. Chicago, R. I. & P. R. Co.*, supra; *Empire Mill Co. v. Lovell*, 77 Iowa 100; *Wilson v. Dunreath Red-Stone Quarry Co.*, 77 Iowa 429; *Osgood v. Bauder & Co.*, 82 Iowa 171; *Metropolitan Nat. Bank v. Commerce State Bank*, 104 Iowa 682.

The witness whose testimony we have quoted above did not know personally the man with whom he talked, nor was he asked to detail the facts upon which he based his conclusion that he was the yardmaster of the Chicago, Burlington & Quincy Railway Company. His conclusion that the stranger purported to be the yardmaster was not sufficient to establish his relation as such. The same is true of the further statement made by the witness that "he appeared to be from all appearances the yardmaster." The only portion of the testimony complained of that was in any way prejudicial to appellant was the statement that "two of the number had been killed." This statement carried with it an implication of negligence on the part of the carrier. The mere statement that two horses were not in the yards could not have been prejudicial, as that fact is not disputed. It was the duty of the carrier to deliver all of the animals to the shipper at destination. The shipment was completed by delivery of the horses to appellee at St. Louis, a change in destination having been made. Appellee transacted no business with the supposed yardmaster in any way relating to the transportation of the animals, and we may assume that he would have nothing to do with the shipment until the car arrived at the yards. The purpose of the inquiry made by appellee was to locate the horses in the yards. The answer of the supposed yardmaster to this inquiry was correct, and could have been in no sense prejudicial to appellant. Just what will amount to prima-facie proof of agency, so as to admit the declarations of the agent, is often difficult of determination.

It is not possible for a shipper, who, in the transportation

of stock, must often deal with many agents and employees of the carrier, to stop and inquire as to whether they are such, or to determine accurately the scope of their employment. He must rely, in large measure at least, upon the appearance and assumptions of the party with whom he deals; and usually the indicia of authority are sufficient. The question must be determined largely by the peculiar facts of each case. The conversation in question occurred in the yards, and at a place where the yardmaster would be likely to be found while in the discharge of at least some of his duties. The assumption of appellee that the party with whom he talked was the yardmaster may have been not unnatural, but it seems to us that the competent evidence admitted by the court falls short of proving agency. *Gibson v. Adams Exp. Co.*, 187 Iowa 1259, relied upon by appellee, is not an authority for his claim. The facts of that case clearly distinguish it from the case at bar. But, even if we should hold to the contrary, there is no escape from the

4. EVIDENCE: *res gestae*: narrative of past event.

fact that the statements of the yardmaster as to the killing of the animals were mere narrative of a past event, and clearly not a part of the *res gestae*. For this reason, it was not admissible, or binding upon appellant. There is nothing in the record in any way tending to show that the agent, if agency was established, was authorized to bind his principal by the statement that one horse and the mule were killed, or that the transaction to which he was testifying was one in which he took part. If the statement amounted to nothing more than an affirmation of the undisputed fact that one horse and the mule were missing, it would, even if hearsay, have been without prejudice. The effect of the statement is somewhat greater than this, and may have carried with it the implication that the death of the animals was the result of the carrier's negligence. The evidence upon the record made should have been excluded, and we cannot say that it was not prejudicial.

III. Appellant requested the court to instruct the jury that the usual and ordinary movements in the course of transportation of freight trains, although accompanied by some jolting or jarring, do not constitute negligence, and that, unless

they found from the evidence that the defendant or its connecting carrier was guilty of negligence in the shipment proximately causing the injuries complained of, their verdict should be for the defendant. The court refused to give this instruction. The court, however, fully instructed the jury on the subject of negligence. They could not have been misled as to the law of the case. It is a matter of common knowledge that there is more or less unavoidable jolting in the operation of freight trains. This the jury must be presumed to have known.

For the error in admitting the evidence above set out, the judgment of the court below must be and is—*Reversed.*

ARTHUR, C. J., and DE GRAFF and VERMILION, JJ., concur.